767 S.E.2d 726

Loren Anthony MASON, Jr.

v.

COMMONWEALTH of Virginia.

Record No. 1542–13–2.

Court of Appeals of Virginia,
Richmond.

Feb. 3, 2015.

Paul S. Roskin (Vergara & Associates, on brief), for appellant.

Kathleen B. Martin, Senior Assistant Attorney General (Mark R. Herring, Attorney General, on brief), for appellee.

Present: HUFF, C.J. FRANK, HUMPHREYS, FELTON, KELSEY, PETTY, BEALES, ALSTON, McCULLOUGH, CHAFIN and DECKER, JJ.

## UPON A REHEARING EN BANC

KELSEY, Judge.

The trial court convicted Loren Anthony Mason, Jr., of various drug offenses [1] based upon evidence obtained during a traffic stop of a vehicle in which he was a passenger. Prior to trial, Mason moved to suppress the evidence, claiming that the traffic stop was unconstitutional. The trial court disagreed, denied the motion, and convicted Mason of the charged offenses.

On appeal, Mason challenges the trial court's denial of his motion to suppress. A divided panel of this Court agreed with Mason, reversed the trial court's ruling on the motion to suppress, and remanded the matter to the trial court. *Mason v. Commonwealth*, 63 Va.App. 587, 760 S.E.2d 831 (2014). We granted the Commonwealth's petition for rehearing *en banc*, vacated the panel opinion, and now affirm the decision of the trial court.[2]

### I.

■ We restate the facts "in the light most favorable to the Commonwealth, giving it the benefit of any reasonable infer-

---

1. These offenses include distribution of marijuana, Code § 18.2–248.1; possession of a Schedule I or II controlled substance, Code § 18.2–250; and possession of a Schedule I or II controlled substance with the intent to distribute, Code § 18.2–248.

2. On January 1, 2015, Judge Huff succeeded Judge Felton as chief judge. Justice Kelsey prepared and the Court adopted the opinion in this case prior to his investiture as a Justice of the Supreme Court of Virginia. Judge Felton and Judge Frank participated in the hearing and decision of this case prior to the effective date of their retirements on December 31, 2014.

ences." *Glenn v. Commonwealth,* 49 Va.App. 413, 416, 642 S.E.2d 282, 283 (2007) (*en banc* ) (internal quotation marks omitted), *aff'd,* 275 Va. 123, 654 S.E.2d 910 (2008). "In doing so, we consider facts presented both at the suppression hearing and at trial." *Elliott v. Commonwealth,* 61 Va.App. 48, 51, 733 S.E.2d 146, 148 (2012).

In this case, a police officer testified that, while operating a stationary radar unit, he saw a sedan with a "dangling object" that was "hanging from the rearview mirror." App. at 24. The officer testified that he "saw it clearly" as the vehicle "went by" him at "approximately 2:30 in the afternoon." *Id.* at 21, 31. The object, reproduced below, was admitted into evidence.

In his testimony, the officer identified this object as the "dangling object that [he] saw on that particular day." *Id.* at 24. It is an opaque parking pass measuring five inches long and three inches wide. When asked if the dangling parking pass that he observed "could obstruct a driver's view," the officer replied unequivocally, "It could, yes, ma'am." *Id.* at 31. Code § 46.2–1054 prohibits, among other things, any object from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the

highway through the windshield, the front side windows, or the rear window." Mason conceded in the trial court that the officer made a traffic stop of the sedan believing that "he was acting properly" pursuant to Code § 46.2–1054. *Id.* at 89.

At the time of the traffic stop, Mason was a passenger in the sedan. The officer intended to issue the driver a summons for driving without a seatbelt and for violating Code § 46.2–1054. Prior to issuing the summons, however, the officer asked the driver if he would consent to a "weapons" pat down. *Id.* at 58. The driver consented, and the officer found marijuana on the driver during the pat down.

The officer then searched the sedan and found a backpack containing cocaine, ecstasy pills, a "large sum of individually wrapped bags" of marijuana, *id.* at 130, a digital scale, and a box of plastic bags. Other evidence established that the backpack belonged to Mason. The officer then arrested Mason for possession of drugs. A search of Mason incident to his arrest yielded $3,381 in cash and a cell phone on his person.

Prior to trial, Mason sought to suppress all incriminating evidence gathered during the traffic stop on the basis that no officer could reasonably suspect that the parking pass violated Code § 46.2–1054. At the suppression hearing, the trial judge made various remarks from the bench suggesting his inclination to grant the motion to suppress. After making these remarks, however, the judge "asked for additional time to consider" the issue, *id.* at 101, and issued an order stating that the court needed "more time to deliberate on the motion to suppress," *id.* at 98. The trial judge also took a "view of the scene," *id.* at 101, to determine if the parking pass could obstruct a driver's vision in a sedan similar to the one that the officer had stopped. *See* Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (Apr. 1, 2014) (stipulation of counsel).

At a later hearing, the judge advised counsel that he had reconsidered his earlier remarks.[3] He said that his initial

---

3. The trial judge's initial comments were superseded by the court's ultimate ruling and contemporaneous explanation for it. It is the

"concern" was that the parking pass did not "*substantially obstruct*" the driver's view of the highway. App. at 102 (emphasis added). But after reviewing the caselaw "stacked up against [him]," the judge explained, he realized that neither the statute nor the reasonable suspicion standard required a substantial obstruction. *Id.* at 105. The case law he reviewed included an unpublished opinion from our Court, *Commonwealth v. Bryant*, No. 0076–04–1, 2004 WL 1313044, at *1, 2004 Va.App. LEXIS 283, at *4 (Va.Ct.App. June 15, 2004), which reversed a suppression order when an officer had stopped a vehicle displaying an "air freshener hanging from the rear view mirror" that "could" have obstructed the driver's view in violation of Code § 46.2–1054. *Accord Richardson v. Commonwealth*, No. 0946–13–3, 2014 WL 1041799, at *1, 2014 Va.App. LEXIS 98, at *4, *11 (Va.Ct.App. Mar. 18, 2014) (upholding a traffic stop when the officer observed that an air freshener "could be in violation" of Code § 46.2–1054); *Pegram v. Commonwealth*, No. 1041–95–2, 1996 WL 537862, at *1, 1996 Va.App. LEXIS 611, at *2 (Va.Ct.App. Sept. 24, 1996) (validating a traffic stop pursuant to Code § 46.2–1054 given the officer's observation of a "large cloth object" hanging from the rearview mirror).

Acknowledging that he "initially disagreed" with the view taken by these unpublished (and thus nonbinding) opinions, the trial judge explained that "what carrie[d] the day" was the definition of "obstruction." App. at 105. "[U]ltimately it's the

---

court's holding—not the judge's off-the-cuff remarks from the bench— that accompanies the final order on appeal to us. Viewed in context, none of the judge's initial remarks (which he later explained were based upon an inaccurate legal standard) can be fairly deemed "factual findings." *Infra* at 313–14, 767 S.E.2d at 737. Mason's argument to the contrary presents a good example of why "[w]e are particularly skeptical ... of appellate efforts to piece together ... fragmented remarks from the bench" in an effort to undermine the court's ultimate holding, *White v. White*, 56 Va.App. 214, 218, 692 S.E.2d 289, 291 (2010), and why we traditionally decline the invitation to "fix upon isolated statements of the trial judge taken out of the full context in which they were made, and use them as a predicate for holding the law has been misapplied," *Damon v. York*, 54 Va.App. 544, 555, 680 S.E.2d 354, 360 (2009) (internal quotation marks omitted).

definition that persuaded the Court that that's what the law is intended and that's what the law says." *Id.* Repudiating some of his earlier statements, the trial judge held:

> [T]he Court is of the opinion that the standard for [the officer] to have stopped the vehicle was[:] is there *reasonable suspicion* that this object is ... cutting off from sight or blocking an unhampered, ... unrestricted *view of the highway?* Well, *there is reason to believe that it could be,* because there is an object dangling. He is entitled constitutionally to investigate further. So the Court believes that the presence of the object is, in fact, sufficient reasonable suspicion to justify a detention of the vehicle.

*Id.* (emphasis added).[4] In short, the trial court explained, "[I]t's a parking pass, it's not a driving pass." *Id.* at 40.

## II.

### A. The Reasonable Suspicion Standard

■■■■ Reasonable suspicion is simply suspicion that is reasonable. It is not something more than suspicion. And it can hardly be called proof. To be sure, the degree of certitude required by reasonable suspicion is " 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than that for probable cause.' " *Perry v. Commonwealth,* 280 Va. 572, 581, 701 S.E.2d 431, 436 (2010) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)); *see also Navarette v. California,* —— U.S. ——, ——, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014). Consequently, "the mere possibility of an innocent explanation does not necessarily exclude a reasonable suspicion that the suspect might be violating the law." *Morris*

---

4. The trial judge had acknowledged earlier that "the question we have now is [whether there] is reasonable suspicion to believe that there is a traffic infraction taking place[.] So again, is there reasonable suspicion to believe that [the parking pass] *is obstructing* ... the driver's *clear view of the highway through the windshield?* " App. at 40–41 (emphasis added); *see also id.* at 84.

*v. City of Va. Beach*, 58 Va.App. 173, 183, 707 S.E.2d 479, 483 (2011) (internal quotation marks omitted).

No one can be arrested on the basis of reasonable suspicion. It serves merely to justify a brief detention to investigate. Because the need for justification is quite low, so too is the justifying legal standard. *See* 4 Wayne R. LaFave, *Search & Seizure* § 9.5(b), at 658–59 (5th ed.2012) (noting that reasonable suspicion requires merely "that there exists at the time of the stop a substantial possibility—or, indeed, *even a 'moderate chance'*—that [unlawful] conduct has occurred, is occurring, or is about to occur" (emphasis added) (footnotes omitted) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371, 129 S.Ct. 2633, 2639, 174 L.Ed.2d 354 (2009))).

■ In suppression hearings, a police officer usually takes the stand and describes what he saw and, occasionally, why he did what he did. While the first part is highly relevant, the second is not. "Examining the subjective intent of the officer 'is fundamentally inconsistent with our Fourth Amendment jurisprudence,' *Kentucky v. King*, —— U.S. ——, ——, 131 S.Ct. 1849, 1859, 179 L.Ed.2d 865 (2011), because 'the Fourth Amendment regulates conduct rather than thoughts,' *Ashcroft v. al-Kidd*, —— U.S. ——, —— ———, 131 S.Ct. 2074, 2080–81, 179 L.Ed.2d 1149 (2011) (noting narrow exceptions)." *Washington v. Commonwealth*, 60 Va.App. 427, 435, 728 S.E.2d 521, 525 (2012).

■ For these reasons, settled precedent governing Fourth Amendment cases has "repeatedly rejected a subjective approach." *Fernandez v. California*, —— U.S. ——, ——, 134 S.Ct. 1126, 1134, 188 L.Ed.2d 25 (2014) (internal quotation marks omitted); *see also Robinson v. Commonwealth*, 273 Va. 26, 37, 639 S.E.2d 217, 223 (2007) (holding that the officer's "subjective motivation is irrelevant" (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006))). A police officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify the action.'" *Stuart*, 547 U.S. at 404, 126 S.Ct. at 1948 (brackets omitted) (quoting *Scott v. United States*, 436

U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)); *see also Navarette*, —— U.S. at ——, 134 S.Ct. at 1687; *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985).[5] Consequently, an "officer's *subjective characterization* of observed conduct is *not relevant*" to an objective application of the Fourth Amendment. *Jones v. Commonwealth*, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010) (emphasis added and internal quotation marks omitted); *see also Stuart*, 547 U.S. at 404, 126 S.Ct. at 1948.[6]

■ Because courts "do not examine the subjective understanding of the particular officer involved," *Heien v. North Carolina*, —— U.S. ——, ——, 135 S.Ct. 530, 539, 190 L.Ed.2d 475 (2014), it necessarily follows that, when deciding a suppression motion, a court should not limit itself "to what the stopping officer says or to evidence of his subjective rationale," *Raab v. Commonwealth*, 50 Va.App. 577, 583 n. 2, 652 S.E.2d 144, 148 n. 2 (2007) (*en banc* ) (quoting *United States v. Brown*, 232 F.3d 589, 594 (7th Cir.2000)).[7] Courts should instead "look to the record as a whole to determine what facts

---

**5.** So strong is this principle that, even when an officer's testimony shows that he misjudged the legal basis for the stop, his subjective misjudgment does not undermine the objective validity of a stop that could be based on a wholly different legal basis. *See, e.g., Slayton v. Commonwealth*, 41 Va.App. 101, 109, 582 S.E.2d 448, 451–52 (2003) (applying this principle to arrests); *McGuire v. Commonwealth*, 31 Va.App. 584, 596–97, 525 S.E.2d 43, 49 (2000) (same); *Golden v. Commonwealth*, 30 Va.App. 618, 625, 519 S.E.2d 378, 381 (1999) (same).

**6.** *See also Bond v. United States*, 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 1465 n. 2, 146 L.Ed.2d 365 (2000); *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996); *Scott*, 436 U.S. at 138, 98 S.Ct. at 1723–24; *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir.2013); *United States v. Singh*, 363 F.3d 347, 356 (4th Cir.2004); *United States v. McKie*, 951 F.2d 399, 402 (D.C.Cir.1991); *Harris v. Commonwealth*, 276 Va. 689, 697, 668 S.E.2d 141, 146 (2008); *Robinson*, 273 Va. at 37–38, 639 S.E.2d at 223–24.

**7.** *See Washington*, 60 Va.App. at 434, 728 S.E.2d at 525; *Shifflett v. Commonwealth*, 58 Va.App. 732, 736 n. 2, 716 S.E.2d 132, 135 n. 2 (2011); *Morris*, 58 Va.App. at 179, 707 S.E.2d at 481; *Thomas v. Commonwealth*, 57 Va.App. 267, 273–75, 701 S.E.2d 87, 90–91 (2010); *Armstead v. Commonwealth*, 56 Va.App. 569, 579 n. 7, 695 S.E.2d 561, 565 n. 7 (2010).

were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." LaFave, *supra*, § 9.5(a), at 647 n. 22 (quoting *United States v. McKie*, 951 F.2d 399, 402 (D.C.Cir.1991)). Because the reasonable suspicion test "is *purely* objective," the reasonable suspicion standard imposes "no requirement that an *actual suspicion* by the officer be shown." *Id.* § 9.5(a), at 647 (second emphasis added). This approach "is obviously far preferable to a system based on the suppositions of individual officers." *Fox v. Commonwealth*, 43 Va.App. 446, 450, 598 S.E.2d 770, 772 (2004).

We thus reject Mason's contention that an officer making an investigatory stop must actually articulate, from the witness stand, the articulable facts and then explain, in his personal opinion, why these facts prompted him to be suspicious. Any assertion to the contrary is inconsistent with prior *en banc* precedent from our Court, *Raab*, 50 Va.App. at 583 n. 2, 652 S.E.2d at 148 n. 2, as well as the uniform view among courts that have addressed this issue.[8]

B. OBSTRUCTING A DRIVER'S "CLEAR VIEW OF THE HIGHWAY"

██ Code § 46.2–1054 prohibits, among other things, any object[9] from being "suspended from any part of the motor vehicle in such a manner as to obstruct the driver's clear view of the highway through the windshield, the front side windows, or the rear window." Applied to a sedan, this portion of the

---

8. *See, e.g., United States v. Bailey*, 622 F.3d 1, 5–6 (D.C.Cir.2010); *Brown*, 232 F.3d at 594; *United States v. Ozbirn*, 189 F.3d 1194, 1198–99 (10th Cir.1999); *United States v. Swann*, 149 F.3d 271, 272 (4th Cir.1998); *United States v. Jones*, 990 F.2d 405, 408 (8th Cir.1993); *McKie*, 951 F.2d at 402; *United States v. Causey*, 834 F.2d 1179, 1183–84 (5th Cir.1987); *United States v. Hawkins*, 811 F.2d 210, 213 (3d Cir.1987); *State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n. 2 (Iowa 2001); *Zimmerman v. N.D. Dep't of Transp. Dir.*, 543 N.W.2d 479, 482–83 (N.D.1996).

9. Code § 46.2–1054 expressly exempts the "rear view mirror, sun visor, or other equipment of the motor vehicle approved by the Superintendent [of the Department of State Police]." *See also* Code § 46.2–1005 ("Procedure for approval of equipment").

statute has three components: (i) something "suspended" (ii) that serves to "obstruct" a "clear view of the highway" (iii) through the windshield, the front side windows, or the rear window. *Id.*

██ By statute, a highway includes "the *entire width between the boundary lines* of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Code § 46.2–100 (emphasis added). A highway is not, as Mason presumes, simply the stretch of pavement immediately in front of a driver's vehicle. Under Virginia law, a "highway" is not limited "to a hard-surfaced or partly hard-surfaced way or to a dirt and gravel way. It does not confine a highway to the main-travelled portion of the way or to lanes specifically designated for vehicular traffic." *Crouse v. Pugh,* 188 Va. 156, 164–65, 49 S.E.2d 421, 426 (1948); *see also Jessee v. Slate,* 196 Va. 1074, 1083, 86 S.E.2d 821, 826 (1955).

██ Because a "highway" includes the "entire width between the boundary lines" of the "way or place" used by vehicular traffic, Code § 46.2–100, it includes overhead highway signs,[10] on-ramps and off-ramps, merge lanes, deceleration lanes, roadways,[11] bridges,[12] intersections,[13] shoulders,[14]

---

**10.** *See* Code § 46.2–100 (defining a "traffic control device" as "a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a . . . highway").

**11.** A "roadway," narrower in scope than a highway yet still broad in terms of the surface area it includes, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the shoulder." *Id.* A highway may itself "include two or more roadways." *Id.*

**12.** *See Nelson v. Cnty. of Henrico,* 10 Va.App. 558, 561, 393 S.E.2d 644, 646 (1990).

**13.** *See* Code § 46.2–100 (defining "intersection" as certain areas of highways that "join one another," cross an "intersecting highway," or are crossed "by a pedestrian crosswalk").

**14.** A "shoulder" is defined as "that *part of a highway* between the portion regularly traveled by vehicular traffic and the lateral curbline or

pedestrian crosswalks,[15] and shared-use paths.[16] Thus, a "clear view of the highway," as used in Code § 46.2–1054, no doubt means the pavement itself and everything physically on it. It would make no sense for Code § 46.2–1054 to prohibit a dangling object from obstructing a driver's view of the pavement directly in front him but not a vehicle, bicyclist, or pedestrian [17] moving across that same pavement.

In this case, the police officer testified that he "clearly" observed the parking pass prior to stopping the vehicle. App. at 31. The parking pass is an exhibit. We need no description of it from the officer. We are looking at the very thing that the officer said he clearly saw: an opaque plastic card that is five inches long and three inches wide. And the trial judge had something even better. He took a "view of the scene" to determine if the parking pass could obstruct a driver's vision in a vehicle similar to the one that the officer had stopped. *Id.* at 101; *see* Oral Argument Audio at 9:47 to 9:55, 26:04 to 26:30 (Apr. 1, 2014).

Given these facts, we agree with the trial court that a reasonable officer could suspect that the opaque, five-by-three-inch parking pass dangling from a rearview mirror might violate Code § 46.2–1054 and thus warrant an investigatory stop. Several scenarios illustrate why. The bottom of the parking pass would be at or slightly above eye level for a driver of average height. The parking pass could be at an angle that might partially block a driver's clear view of a

---

ditch." *Id.* (emphasis added); *see also Jessee,* 196 Va. at 1083, 86 S.E.2d at 826.

15. *See* Code § 46.2–100 (defining "crosswalk" as a "part of a roadway," which is part of a highway); *see also supra* note 13 (defining "intersection").

16. "Shared-use paths" include bikeways and other paths that are open to "pedestrians, skaters, users of wheel chairs or wheel chair conveyances, joggers, and other nonmotorized users." Code § 46.2–100.

17. *See Crouse,* 188 Va. at 165, 49 S.E.2d at 426 ("The Motor Vehicle Code of Virginia recognizes the right of both the pedestrian and motorist to use the highways for travel.").

vehicle ahead and to the right of him. If that vehicle put on its left-turn signal, for example, the driver with the parking pass might not see it at all—particularly when the vehicle is merging into highway traffic from an on-ramp. If a driver simply wanted to make a right turn at an intersection, the parking pass could partially obscure his field of vision. An enhanced risk would exist when the driving occurs at night, and only the taillights of a vehicle ahead and to the right are visible. Consider, too, highway signs that are often placed overhead and on the right shoulder of the highway. A person of any height could have his clear view of highway signs partially obstructed by the parking pass, especially during nighttime driving.

It bears repeating that an officer need not have proof beyond a reasonable doubt of any of these scenarios before he makes a vehicular stop. Nor does he need to be convinced by a preponderance of the evidence. To be sure, the quantum of confidence need not even rise to the level of probable cause. *See Perry,* 280 Va. at 581, 701 S.E.2d at 436. It is enough that the officer is aware of facts that, viewed objectively, could give rise to a reasonable suspicion that the parking pass may be non-compliant with Code § 46.2–1054. Settled precedent has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.' " *Navarette,* —— U.S. at ——, 134 S.Ct. at 1691 (quoting *United States v. Arvizu,* 534 U.S. 266, 277, 122 S.Ct. 744, 753, 151 L.Ed.2d 740 (2002)). In this respect, the law employs a "commonsense approach," *id.* at ——, 134 S.Ct. at 1690, that takes into account "the totality of the circumstances—the whole picture," *id.* at ——, 134 S.Ct. at 1687 (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)), and asks simply whether unlawful activity "may be afoot," *id.* at ——, 134 S.Ct. at 1690 (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

Mason does not directly challenge these principles. Instead, underlying much of his argument is the unstated, but implied, assertion that this type of traffic infraction is simply too trifling to warrant an investigatory stop. Underlying

Code § 46.2–1054, however, is the General Assembly's unstated, but implied, recognition that a driver's ability to see clearly through an unobstructed windshield is crucial to the safety of the driver as well as others sharing the road. We certainly concur. At some point in every trial judge's career, he or she has heard a confounded witness, while testifying about a tragic automobile accident, say simply, "I don't know what happened. I just didn't see the other car." Given the multitude of other distractions competing for a driver's attention, it hardly makes sense for the law to treat as trivial the perfectly reasonable suspicion that a five-by-three inch opaque parking pass, hanging from the rearview mirror of a sedan, could obstruct a driver's clear view of the highway.[18]

Needless to say, our holding does not endorse any *per se* rule authorizing traffic stops whenever an object of any kind is observed dangling from a vehicle's rearview mirror. While the prosecutor asserted as much in the trial court, *see id.* at 53, the Attorney General correctly disavowed the overstatement on appeal, *see* Oral Argument Audio at 14:56 to 15:10, 16:22 to 16:57 (Nov. 18, 2014). Code § 46.2–1054, after all, does not uniformly forbid drivers from dangling objects from their rearview mirrors—only those positioned "in such a manner as to obstruct the driver's clear view of the highway." We thus limit our holding to the suspected obstruction in this case: a five-by-three-inch opaque parking pass hanging from a rearview mirror of a sedan.

---

**18.** The dissent argues that the officer's "failure to investigate the existence of the alleged 'criminal activity' is fatal to any justification of Mason's seizure under *Terry* and its progeny." *Infra* at 312, 767 S.E.2d at 736. Mason, however, never made that contention on appeal. To quote him: "In the instant case the only assignment of error is the failure of the trial judge to grant the defendant's motion to suppress evidence seized from the motor vehicle in which the defendant was riding following a traffic stop, *alleging that the officer in question did not have reasonable suspicion to make such stop.*" Appellant's Br. at 6 (emphasis added). *See* Rule 5A:12(c)(1)(i) (limiting appellate review to the assignment of error); Rule 5A:20(e) (requiring appellants to state clearly their "argument (including principles of law and authorities) relating to each assignment of error").

Finally, we acknowledge that the application of the concept of reasonable searches and seizures to Code § 46.2–1054's prohibition on dangling obstructions involves an inescapable exercise in judicial line-drawing. But, as Justice Holmes once said, we should not be "troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law." *Irwin v. Gavit,* 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925). That we must, from time to time, make fine distinctions is no reason to abandon the task altogether [19] and treat all such dangling objects as indistinguishable. A five-by-three inch opaque parking pass is obviously different from a high school graduation tassel or a tiny chain locket. We thus have no fear that our holding will be misconstrued as a constitutional blank check for police officers to make traffic stops under circumstances wholly dissimilar from those presented in this case.[20]

### III.

In sum, the trial court correctly held that a reasonable officer could make an investigatory stop of the sedan in this case to determine if, in fact, the parking pass he observed violated Code § 46.2–1054.[21] Finding no fault with the trial

---

**19.** As for the criticism that this line-drawing exercise requires a case-by-case approach, "truth be told, it is supposed to be this way. The reasonable suspicion standard itself is a 'somewhat abstract' and 'elusive concept' that cannot be reduced to a 'neat set of legal rules.'" *Shifflett,* 58 Va.App. at 739, 716 S.E.2d at 136 (quoting *Arvizu,* 534 U.S. at 274, 122 S.Ct. at 751).

**20.** We agree with our dissenting colleagues that, even if Mason could challenge successfully the legality of the officer's stop of the sedan, that victory would not necessarily require the suppression of any incriminating evidence found during the officer's ensuing consensual searches of the driver or the sedan. *See generally Ellis v. Commonwealth,* 52 Va.App. 220, 226, 662 S.E.2d 640, 643 (2008) ("Our analysis begins with the general rule that 'a search authorized by consent is wholly valid.'" (quoting *Kyer v. Commonwealth,* 45 Va.App. 473, 483, 612 S.E.2d 213, 218 (2005) (*en banc* ))).

**21.** On appeal, Mason argues that the officer's alleged reasonable suspicion was "based on a misapprehension of the law" and, for that reason, "was thus *per se* unreasonable and thus could not be the basis of a valid

court's denial of Mason's motion to suppress, we affirm his convictions.

*Affirmed.*

HUMPHREYS, J., with whom FRANK, PETTY, ALSTON and CHAFIN, JJ., join, dissenting.

The law of search and seizure with respect to automobiles is intolerably confusing.[22]

Every day, millions are stopped for one of the myriad of regulations governing our use of public streets. As soon as you get into your car, even before you turn the ignition key, you have subjected yourself to intense police scrutiny. So dense is the modern web of motor vehicle regulations that every motorist is likely to get caught in it every time he drives to the grocery store.[23]

This case further exacerbates the intolerable confusion referred to by Justice Powell. "Prior to *Terry v. Ohio,* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (citation omitted). *"Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Id.* After today and insofar as motor vehicles are concerned, this exception is no longer particularly limited and

---

investigatory stop . . . ." Appellant's Br. at 8. The United States Supreme Court, however, recently rejected this very argument. *Heien,* —— U.S. at ——, 135 S.Ct. at 539. Given our holding, we need not address the dissent's effort to distinguish *Heien. Infra* at 315–19, 767 S.E.2d at 738–40.

**22.** *Robbins v. California,* 453 U.S. 420, 430, 101 S.Ct. 2841, 2847–48, 69 L.Ed.2d 744 (1981) (Powell, J., concurring).

**23.** Markus Dirk Dubber, *Policing Possession: The War on Crime and the End of Criminal Law,* 91 J.Crim. L. & Criminology 829, 874 (2001). The "War on Crime," "War on Drugs," and "War on Terror" have all been used to justify limits to basic Fourth Amendment protections. I would not add a "War on Dangling Objects" to that list.

has now swallowed the general rule. Despite the majority's assertion to the contrary, I believe that the majority opinion in this case will be read to provide "automatic" reasonable articulable suspicion for any officer to pull a citizen over if he/she observes *any* object dangling from a rearview mirror. Moreover, henceforth, reasonable suspicion justifying the seizure of citizens will be found even if police officers are mistaken concerning the law as long as their testimony includes magic words such as "I thought ... I believed ... I mistakenly believed ... I suspected ... I mistakenly suspected ..." or as in this case, the officer just doesn't really know one way or the other. Therefore, I dissent from the analysis and judgment of the majority.

## I.   Reasonable Suspicion and the Fourth Amendment

Even a cursory review of *Terry* and the cases which follow it reveal often repeated language requiring specific facts in support of an officer's suspicion that criminal activity is afoot. "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. "A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion." *Sokolow*, 490 U.S. at 10, 109 S.Ct. at 1587.

"To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or 'hunch' that criminal activity is afoot." *Rudolph v. Commonwealth*, 277 Va. 209, 210, 722 S.E.2d 527, 528 (2009). "This demand for specificity in the information upon which police action is predicated is the central teaching of [the United States Supreme Court's] Fourth Amendment jurisprudence."

*Terry,* 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18.[24] It is axiomatic that whether or not reasonable suspicion of criminal activity exists must be determined from *"the facts available to the officer at the moment of the seizure." Id.* at 21–22, 88 S.Ct. at 1880 (emphasis added). In this case, the facts do not create a reasonable suspicion of any traffic infraction or other violation of the law.[25]

Moreover, the majority overlooks the basic tenet of *Terry* that the sole constitutionally proper objective of a *Terry* stop is to confirm or dispel suspicion of criminal activity. Jurisprudence from various federal circuits supports this proposition. *See e.g., United States v. Branch,* 537 F.3d 328, 336 (4th Cir.2008) ("If a police officer wants to detain a driver beyond the scope of a routine traffic stop ... he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." (citation omitted)); [26]

---

**24.** "The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of the vehicle.... An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (citations omitted); *see also Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (stopping an automobile and detaining the driver is unreasonable under the Fourth Amendment unless there is at least articulable and reasonable suspicion that the vehicle or an occupant is subject to seizure for violation of the law). When a police officer makes a traffic stop, the passenger is seized within the meaning of the Fourth Amendment and may challenge the constitutionality of the stop. *Brendlin v. California,* 551 U.S. 249, 251, 127 S.Ct. 2400, 2403, 168 L.Ed.2d 132 (2007).

**25.** "We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment." *Royer,* 460 U.S. at 513, 103 S.Ct. at 1332 (Powell, J., concurring).

**26.** Another case from the same circuit, *United States v. Johnson,* 734 F.3d 270, 275 (4th Cir.2013), stands for the proposition that "it is not relevant whether the officers proceed to take further action on the predicate traffic violation" once a vehicle is detained. However, this case is inapplicable to the one before us because in *Johnson* the police officer actually observed and testified to unlawful conduct amounting to probable cause (driving with an illegible license plate in violation of Maryland law) prior to the stop. Conversely, in this case, Officer

*Croom v. Balkwill,* 645 F.3d 1240, 1251 n. 15 (11th Cir.2011) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop"); *United States v. Andres,* 703 F.3d 828 (5th Cir.2013) (holding that a traffic stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges).

I dissent from the analysis and judgment of the majority and would reverse the trial court and remand this case for two reasons. First, Officer Richards's failure to investigate the existence of the alleged "criminal activity" is fatal to any justification of Mason's seizure under *Terry* and its progeny. Second, the testimony of Officer Richards articulated absolutely no facts from which reasonable suspicion of criminal activity can be inferred, and the parking pass, in its capacity as an exhibit, does nothing to overcome that failure.

Officer Richards made no effort whatsoever to investigate the "criminal activity" he asserted to be the basis for the stop. Instead, Officer Richards testified that the only reason he stopped the vehicle was because he observed "a dangling object." [27] Yet, Officer Richards testified that, after stopping the vehicle, he never sat in the driver's seat or otherwise made any attempt to determine if a driver could see the roadway through the windshield given the "dangling object's" size and location behind the rearview mirror. At no point was Officer Richards able to articulate any facts that, even when coupled

---

Richards only observed wholly lawful conduct and surrounding circumstances that fall far short of suggesting that any criminal activity was afoot prior to initiating the stop.

**27.** The majority contends that Officer Richards intended to "issue the driver a summons for driving without a seatbelt and for violating Code § 46.2–1054." However, Officer Richards testified that at the time of the stop, which is the point in time when the existence of reasonable suspicion is determined, the only thing he observed was the dangling object. J.A. at 28–29. Indeed, the record reflects that there was a stipulation by the parties that the dangling object was the only basis for the stop. *Id.*

with an examination of the pass itself and other evidence in the record, would lead to any objective belief that the "dangling object" was suspended "in such a manner as to obstruct the driver's clear view of the highway" as prohibited by Code § 46.2–1054.[28]

Despite the deficiencies in Officer Richards's testimony, the majority asserts that his testimony supplied evidence of "criminal activity" when, after being handed the parking pass as an exhibit in the trial, he noted in response to the prosecutor's abstract question that because of its opaque nature, the 3" × 5" parking pass "could [obstruct a driver's view]."[29] Alternatively, the majority reasons that the parking pass itself supplies the missing articulated evidence of "criminal activity" despite factual findings by the trial court to the contrary. These conclusions are inapposite to *Terry* and its progeny.

As to the former position advanced by the majority, the record is clear that neither Officer Richards's answer to the prosecutor's abstract question, nor the context supplied by the question itself established any facts or reasonable inferences that the parking pass and its placement in the vehicle blocked any view of the highway. If either the answer or the context of the question had done so, the record then would at least have provided the missing evidence of criminality that the majority creates out of whole cloth. In this case, Officer Richards articulated only facts that supported entirely lawful conduct and failed to provide any reason to suspect that criminal activity was occurring or about to occur. Insofar as evidence of "criminal activity" provided by the parking pass

---

**28.** Although appellant raises no issue regarding the vagueness of the statute and thus I do not consider the applicability of our Supreme Court's decision in *Tanner v. City of Virginia Beach*, 277 Va. 432, 438, 674 S.E.2d 848, 852 (2009), it nevertheless seems to me that the fact that the statute suggests a subjective standard of enforcement for police officers, contributes to the majority's flawed analysis.

**29.** On redirect, the attorney for the Commonwealth handed the parking pass to Richards and asked, "So it's not clear that you can't—you can't see through it, so it could obstruct a driver's view?" Officer Richards replied, "It could, yes, ma'am."

itself is concerned, I believe that the unequivocal and reiterated factual findings by the trial court which consistently and repeatedly stated that the parking pass, as placed in the vehicle, would *not* obstruct the driver's view of the highway renders this portion of the majority's analysis untenable.

The majority insists that the trial court's statement, "because there is an object dangling ... [the officer] is entitled constitutionally to investigate further" was the actual factual finding by the trial court rather than simply its legal conclusion. In my view, the context of the trial court's words could hardly be clearer that this statement was actually an erroneous legal holding based upon the Commonwealth's equally erroneous argument that the mere fact that any object was suspended from the rearview mirror, was *per se* sufficient reasonable suspicion of criminal activity to justify the seizure of the vehicle and its occupants.

The majority generally dismisses all of the trial court's statements regarding the parking pass as "the judge's off-the-cuff remarks from the bench." However, immediately following Officer Richards's testimony, and in response to the prosecutor's argument that reasonable suspicion exists to stop the car because there is an object hanging from the mirror that "does obstruct and you can't see through it," the trial court responded,

I will say this to you Ms. Pleas [prosecutor], I think you can hang this [parking pass] on any car in America, and it won't obstruct the view at all. It hangs up on the rearview mirror, which is up here. That doesn't obstruct your view. You don't even see the highway up there. The highway is out here. It doesn't obstruct your view at all. But that's not even the question. Now—but that's not even the question—the question in the case is whether there is reasonable suspicion that the object could obstruct the view. Because it doesn't—I'm trying whether the officer could believe it. And I think it's not an obvious answer to that.

J.A. at 34–35. Contrary to the assertion of the majority, the trial court's subsequent erroneous legal holding does not

nullify or "supersede" its factual findings that the parking pass would not obstruct the view of the driver "on any car in America." Such a conclusion would fly in the face of well-settled law in Virginia that mandates this Court evaluate a trial court's fact-finding through a wholly distinct lens than a trial court's conclusions of law. Indeed, in a Fourth Amendment case, this Court must evaluate both the factual findings and conclusions of law of the trial court. In such a scenario, this Court gives "deference to the factual findings of the trial court" and "independently determine[s]" whether those findings satisfy the requirements of the Fourth Amendment. *Whitfield v. Commonwealth,* 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003). "There is good reason for the rule that appellate courts must defer to the factual findings of the trial judge in Fourth Amendment cases. The fact patterns in such cases arrive in infinite variety, seldom or never exactly duplicated." *Malbrough v. Commonwealth,* 275 Va. 163, 171, 655 S.E.2d 1, 5 (2008).

The factual statements of the trial court regarding the parking pass support only the legal position advanced by the Commonwealth and ultimately adopted by the trial court, that *all* objects suspended from a rearview mirror *per se* provide reasonable suspicion to detain a vehicle's occupants. The majority overcomes this logical deficiency by recasting the trial court's legal conclusion that "an object dangling ... [entitles the officer] constitutionally to investigate further" as a factual finding that the pass obstructs a driver's view of the highway. However, such recasting is outside the proper role of an appellate court. *See Thomas v. Commonwealth,* 48 Va.App. 605, 608, 633 S.E.2d 229, 231 (2006) ("We review the factfinding of a lower court 'with the highest degree of appellate deference.' "); *see also Commonwealth v. Hilliard,* 270 Va. 42, 49–50, 613 S.E.2d 579, 584 (2005) (An appellate court reviews the trial court's "findings of historical fact only for clear error and must give deference to the inferences that may be drawn from those factual findings."). As such, this Court is bound by the repeated factual findings of the trial court that

the parking pass did not, and would not obstruct the view on "any car in America."

## II.   The Officer's Mistake of Law

Officer Richards's failure to investigate the criminal activity suspected here is also fatal to a Fourth Amendment analysis.[30] Investigation of the suspected criminal activity is the only rationale for a detention under *Terry*.   It is axiomatic that if an officer takes no action to confirm or dispel the suspicion of criminal activity, the detention is unwarranted.   Moreover, while pretextual stops are permissible under the Supreme Court's holding in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), that is only so if probable cause exists that an offense has been committed.   Thus, even though the offense for which probable cause exists is a pretext for the real reason for the detention, the existence of probable cause for *any* offense, satisfies the Fourth Amendment. Here, there is no suggestion of probable cause for any offense whatsoever and therefore any detention that does not serve the limited purpose of a *Terry* stop, is necessarily unconstitutional.[31]

It is also obvious to me, as it was to the trial court, that Officer Richards never investigated the "criminal activity" he

---

**30.**   The majority asserts that appellant never raised this issue on appeal. However, appellant clearly challenges the stop of the vehicle, arguing that reasonable suspicion did not exist to justify the *Terry* stop under the Fourth Amendment.   The law is abundantly clear that "reasonable suspicion" must be related to whether criminal activity is afoot.   As such, it is proper and necessary for this Court's analysis to determine if the seizure was conducted in a manner to confirm or dispel suspicion of a violation of Code § 46.2–1054, which should have been the ultimate objective of a *Terry* stop.   Therefore, the assignment of error on appeal fairly encompasses the basis for the stop, the failure to effectuate the purpose of the stop and any mistake of law upon which "reasonable suspicion" was supposedly based.

**31.**   I am not suggesting, however, that a *valid Terry* stop does not prevent a law enforcement officer from generally investigating any and all possible criminal activity that a reasonable officer would suspect given the circumstances, including requesting consent to conduct a search.

asserted was afoot because he mistakenly believed that *any* object suspended from the interior of a vehicle violated the law. The trial court asked counsel "Is it of any probative value that the officer never inquired as to whether—never even looked to see whether the object, in fact obstructed the highway?" J.A. at 47. The trial court then noted, "Listening to [Officer Richards] answering the questions, this was a stop because of the existence of a dangling object. That's what the officer did. And he—and I'm not claiming bad faith. It may be a misapprehension of the law." J.A. at 51. "[Officer Richards] didn't have any idea that this [object] needed to be an obstruction." J.A. at 52.

Significantly, the trial court then asked the prosecutor, "Is it the Commonwealth's position that *any* object that dangles gives rise to the stop of the vehicle?" The prosecutor responded in the affirmative, and the trial court noted "I think you've got to get there. I think that's what you've got to argue." "[S]o the issue becomes, and where the Court has put its focus, is whether or not essentially *the mere fact of a dangling object gives the officer reasonable suspicion* to stop to determine whether or not the object, and I quote the statute *'obstructs the driver's clear view of the highway.'* " J.A. at 102 (emphasis added). The trial court ultimately and, in my view, erroneously, adopted the Commonwealth's argument as its holding, relying upon two circuit court opinions and an unpublished opinion of this Court and never considered the officer's failure to actually investigate the statutory violation as a factor in its analysis.

The Commonwealth previously maintained on brief and at oral argument before the panel, the position it took at trial and that the trial court adopted, that "dangling objects" *per se* "provide reasonable suspicion to stop any vehicle." The Commonwealth retreated from this position to the "know it when you see it" reasonable suspicion standard for the first time in oral argument before this Court sitting *en banc,* implying without overtly arguing that the trial court now was right but for the wrong reason. The majority now adopts this standard. In my view, the Commonwealth is incorrect in both its original

and revisionist positions on the application of the law. Moreover, without any guidance or any limitations to lower courts or police officers, the majority's analysis amounts to choosing the latter option of overreaching hindsight in the Hobson's Choice of either agreeing with the trial court and the Commonwealth's original position that it is objectively reasonable to stop *all* motor vehicles with *any* object hanging from the mirror regardless of any possible obstruction of the view of the highway, and the alternative "we will know it when we see it" standard advanced today pursuant to *de novo* fact-finding by this Court regarding the object in question.

To be clear, a traffic stop will be deemed a reasonable "seizure" when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop. An officer need not be factually accurate in his belief that a violation has occurred, but, instead, need only produce facts establishing that he *reasonably* believed a violation had taken place. *Illinois v. Rodriguez*, 497 U.S. 177, 185–86, 110 S.Ct. 2793, 2799–800, 111 L.Ed.2d 148 (1990) (emphasis added). In order to satisfy the reasonableness requirement of the Fourth Amendment, what is necessary of "the police officer conducting a search or seizure under one of the exceptions to the warrant requirement ... is not that they always be correct, but that they always be reasonable." *Id.* at 185, 110 S.Ct. at 2800. However, reasonableness will not normally be found in mistakes of law by a police officer.

The United States Supreme Court recently held that only *objectively reasonable* mistakes of law are acceptable excuses from strict compliance with the Fourth Amendment. Significantly, for the purposes of the analysis here, the Supreme Court rejected the proposition that a good faith mistake of law was *per se* unreasonable under the Fourth Amendment, but Chief Justice Roberts clarified that "[t]he limit is that the mistakes must be those of reasonable men." *Heien v. North Carolina*, —— U.S. ——, ——, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). "An officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound

to enforce." *Id.* at ——, 135 S.Ct. at 539–40. The statute in question in *Heien* contained confusing language, making it unclear whether only one working "stop lamp" (brake light) was required by law, especially considering another statute seemed to suggest that vehicles must have "all originally equipped rear lamps or the equivalent in good working order." *Id.* at ——, 135 S.Ct. at 540.

Unlike the statute in *Heien* that involved a difficult issue of statutory interpretation well outside the ken of non-lawyer police officers, the statute at issue in this case suffers from no such infirmity. No objectively reasonable officer could sensibly conclude from a reading of Code § 46.2–1054 that an object simply hanging from the rearview mirror is unlawful, unless it also obstructs the driver's clear view of the highway. Indeed, it is evident from the totality of Officer Richards's testimony that the trial court was correct in observing that Officer Richards mistakenly believed that *any* object suspended from the interior of a vehicle constituted a Class 4 misdemeanor pursuant to Code § 46.2–1054, as opposed to only those objects which are suspended "in such a manner as to obstruct the driver's clear view of the highway."

The alleged traffic infraction (merely having a parking pass suspended from the rearview mirror) that formed the basis of the stop, was at best the sort of "sloppy study" of Code § 46.2–1054 referred to by Chief Justice Roberts in *Heien.* To hold otherwise ignores the observation by both the majority and dissent in *Heien* that it would be a *rare* situation where the law is so confusing that it would be reasonable for a police officer to be unaware of it. Further, such a holding would also mean that ignorance of the plain language used in the law, as opposed to any nuanced interpretation of it, is an automatic excuse for police officers, although certainly not for those they arrest. Since Officer Richards was unable to testify to any facts, objectively viewed, that would support reasonable suspicion that the parking pass violated Virginia law, application of the Supreme Court's holding in *Heien* compels a conclusion that Officer Richards's objectively unreasonable mistake of law was insufficient to justify a stop under the Fourth Amendment.

Moreover, several other states with similar statutes to Code § 46.2–1054 have also held that the mere presence of dangling objects from the rearview mirror, without facts supporting an objective officer's reasonable suspicion that the object was obstructing the driver's view of the highway, violates the Fourth Amendment. *See e.g. People v. Arias*, 159 P.3d 134, 138–39 (Colo.2007) (holding that a motor vehicle stop was unjustified because the officer who erroneously thought that an air freshener hanging from a rearview mirror, regardless of whether it "obstructed" the "driver's vision through any required glass equipment," was a violation of Colorado law had not testified to any facts to support an objective finding that the air freshener obstructed driver's view); *People v. Cole*, 369 Ill.App.3d 960, 314 Ill.Dec. 171, 874 N.E.2d 81, 87–88 (finding that a motor vehicle stop was unjustified because the officer did not realize the statute required the suspended object to "materially obstruct" the driver's view and that despite the officer's mistaken interpretation of the law, was unable to articulate facts that a reasonable officer would have found to support reasonable suspicion that the defendant, who had beads hanging from his rearview mirror, was violating the law as written), *cert. denied*, 223 Ill.2d 644, 310 Ill.Dec. 251, 865 N.E.2d 971 (2007); and *State v. Cyrus*, 297 Conn. 829, 1 A.3d 59, 68 (2010) (holding that an officer's mistaken belief that any object hanging from the rearview mirror violated Connecticut law could not support a finding of reasonable suspicion because the officer's testimony offered no facts or any objective basis to conclude he suspected that the chain and cross hanging from the defendant's rearview mirror obstructed the driver's view or that such a belief would have been objectively reasonable).

The majority asserts that "our holding does not endorse any *per se* rule authorizing traffic stops whenever an object of any kind is observed dangling from a vehicle's rearview mirror." Yet, its analysis, failing as it does to provide any substantive guidance to police and trial courts, has the consequence of implying just the opposite—that it is nevertheless reasonable to stop *any* vehicle, *any* time, if it has *any* object suspended

from the mirror or windshield. It does not matter that the object may be a parking pass, graduation tassel, GPS receiver, government issued toll transponder, or any other object no matter the size. All such vehicles may now be stopped and the occupants detained in the sure and certain knowledge that today's precedent will justify their stop despite any testimonial deficiency in the articulation of facts establishing reasonable suspicion of criminal activity, any failure to conduct an investigation into the suspected criminal activity, and even ignorance of the plain language of the statute in question by those supposed to enforce it.

### III. The Exclusionary Rule

Although, for the reasons stated, I would hold that Mason's Fourth Amendment rights were violated when the vehicle in which he was a passenger was stopped, I cannot say based upon the record before us that the exclusionary rule requires the suppression of the evidence in this case. *See Hudson v. Michigan*, 547 U.S. 586, 592, 126 S.Ct. 2159, 2164, 165 L.Ed.2d 56 (2006) (noting that the exclusionary rule does not apply to " 'every item of evidence that has a causal connection with police misconduct' " (quoting *Segura v. United States*, 468 U.S. 796, 829, 104 S.Ct. 3380, 3398, 82 L.Ed.2d 599 (1984) (Stevens, J., dissenting))). Mason had no apparent standing to object to the seizure or search of the driver, and the trial court, having denied the motion to suppress, made no determination as to whether the driver's consent to search his person, which led to the search of the car and the discovery of evidence against Mason, attenuated any illegality of the stop as it pertained to and affected Mason. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973) (holding that whether an individual's consent to a search was voluntary is a factual question); *United States v. Seidman*, 156 F.3d 542, 548 (4th Cir.1998) (concluding that after the trial court determined that the officer entered Seidman's residence in violation of the Fourth Amendment and that Seidman voluntarily consented to the conversation with the officer, the trial court should have gone further and determined "whether

the taint arising from the unlawful entry was sufficiently attenuated by the consent").

## IV.  Conclusion

Concluding as I do that the trial court erred in its holding that reasonable suspicion existed to justify the seizure of the vehicle and its occupants under the Fourth Amendment, I would reverse and remand for a new trial including a determination by the trial court regarding the applicability of the exclusionary rule if the Commonwealth is so advised.